Presented to the Court by the foreman of the
Grand Jury in open Court, in the presence of
the Grand Jury and FILED in the U.S.
DISTRICT COURT at Seattle, Washington.

_January 16_ 20_19_

WILLIAM M. McCOOL, Clerk

By _____ Deputy

# UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF WASHINGTON
### AT SEATTLE

UNITED STATES OF AMERICA,

    Plaintiff,

    v.

HUAWEI DEVICE CO., LTD., and
HUAWEI DEVICE USA, INC.,

    Defendants.

NO. **CR19-010** RSM

INDICTMENT

The Grand Jury charges that:

## COUNT 1
### (Theft of Trade Secrets Conspiracy)

1.    Beginning at a time unknown, but no later than in or about June 2012, and continuing until on or about September 2, 2014, at Bellevue, within the Western District of Washington, and elsewhere, HUAWEI DEVICE CO., LTD., HUAWEI DEVICE USA, INC., and others known and unknown, conspired and agreed together to:

(a) knowingly and without authorization steal, appropriate, take, carry away, and conceal trade secrets belonging to T-Mobile; and by fraud, artifice, and deception obtain trade secrets belonging to T-Mobile;

(b) knowingly and without authorization copy, duplicate, sketch, draw, photograph, download, replicate, transmit, deliver, send, communicate, and convey trade secrets belonging to T-Mobile; and

INDICTMENT/HUAWEI DEVICE CO. et al. - 1

(c) knowingly receive, buy, and possess trade secrets belonging to
T-Mobile, knowing the same to have been stolen, appropriated, obtained,
and converted without authorization;

intending to convert a trade secret that is related to a product used and intended for use in
interstate and foreign commerce, to the economic benefit of someone other than
T-Mobile, and knowing that the offense would injure T-Mobile.

At all times relevant to this Indictment:

**A.      T-Mobile and the Tappy Robot System.**

2.      T-Mobile USA, Inc. ("T-Mobile" or "TMO") is one of the largest providers
of wireless service in the United States.  T-Mobile is headquartered in Bellevue,
Washington, and is partially owned by Deutsche Telekom, a German company.
T-Mobile, as part of its business, sells mobile phones that are packaged with wireless
service.  Although T-Mobile provides the wireless service, third parties manufacture the
phones that T-Mobile sells.

3.      In or about 2006, T-Mobile began developing a proprietary robotic phone
testing system, nicknamed "Tappy."  Testing new phones before they are launched is
important to wireless carriers such as T-Mobile.  This testing identifies software errors
and other problems in new phones before they are sold to customers.  Correcting these
errors prior to launching a new phone helps enable T-Mobile and other carriers to avoid
damaging their reputation by launching phones in the market that suffer from software
bugs or other problems, and to avoid the significant costs associated with customer
returns of defective devices.

4.      T-Mobile created Tappy to be an innovative way to test phones.  T-Mobile
developed and refined the Tappy system over several years, at significant expense to
T-Mobile, both in terms of actual dollars expended and employee time to develop and
refine the system.  The Tappy robot is a largely automated testing process that tests a
phone for an extended period to measure the phone's performance and stability under
prolonged usage, saving the employee time that would be expended with manual testing

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

of the phone. The Tappy robot performs "touches" on phones that simulate how people use their phones. Tappy tests, among other things, the responsiveness, performance, and stability of the phone's user interface. Tappy also records and tracks the phone's performance during testing, including measuring the battery life expended by particular tasks. Tappy's largely automated testing system was unique as compared to the way other wireless carriers tested phones at the time, which typically involved software that performed a variety of tests on phones or manually testing phones to approximate how customers would use them.

5.      Tappy was valuable to T-Mobile for several reasons. First, T-Mobile found that Tappy was an improvement over other testing systems in the market. This improvement was reflected in the fact that T-Mobile experienced a significant decline in customer returns after Tappy was implemented, which reduced costs for T-Mobile. Tappy played a part in this decline by catching errors and problems upfront before T-Mobile released the phones in the market. Second, T-Mobile believed that Tappy provided the company with a competitive edge over other wireless carriers, none of which used a robotic testing system. T-Mobile publicly marketed Tappy as improving phone quality, which contributed to the value of the T-Mobile brand. Third, Tappy had significant potential licensing and sales value for T-Mobile. Over time, T-Mobile received multiple inquiries about licensing or purchasing the Tappy system. As the exclusive owner and holder of this technology, T-Mobile had the option to sell Tappy for a price that would have been higher than if the system were available from other parties as well. In this way, Tappy represented a valuable asset that T-Mobile had the option of further monetizing.

6.      In recognition of its proprietary value, T-Mobile implemented a number of measures to protect the Tappy technology and keep it confidential. For example, T-Mobile housed its Tappy robots in a secure laboratory at its headquarters that required special badge access to enter. The laboratory had security cameras and a security guard posted at the front desk of the building that housed the laboratory. T-Mobile patented

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

various aspects of Tappy – although the system could not be replicated solely from the patent materials.  T-Mobile also kept a secure hold on the details about how Tappy was constructed, and declined the offers described above to license or sell the technology to phone manufacturers and other third parties.

7.     When T-Mobile initially implemented Tappy, only T-Mobile employees were allowed to operate the robot.  Over time, T-Mobile allowed approved employees from phone suppliers to use Tappy to test phones that were scheduled for release.  With this expanded access, T-Mobile implemented a series of additional measures to safeguard the confidentiality of Tappy and its technology.  For example, T-Mobile set up a separate portion of its laboratory for suppliers to test phones on Tappy.  T-Mobile also required suppliers to execute nondisclosure and confidentiality agreements before being able to access and operate Tappy.  These agreements included multiple confidentiality provisions, including provisions barring suppliers' employees from attempting to reverse engineer Tappy, or take any photographs or videos of the Tappy robots.  T-Mobile limited access to Tappy to only a select few employees from each supplier; these suppliers' employees were approved and trained by T-Mobile.  Moreover, T-Mobile permitted these employees to access Tappy only from within T-Mobile's secure laboratory, only for limited time periods, and only to test phones that were scheduled for release and for no other purpose.

## B.     T-Mobile's Business Relationship with Huawei.

8.     Huawei is a telecommunications company that, among other things, manufactures and sells phones to wireless carriers.  Huawei operates through multiple corporate entities, including as HUAWEI DEVICE CO., LTD. ("HUAWEI CHINA"), which is located in China, and HUAWEI DEVICE USA, INC. ("HUAWEI USA"), which operates in the United States, with offices in Bellevue, Washington, and Plano, Texas, among other locations.  HUAWEI CHINA designs and manufactures wireless phones.  HUAWEI USA sells and distributes Huawei products, including wireless phones, in the United States.  HUAWEI USA also assists in the testing of phones by the

1  carriers and facilitating the resolution of issues reported during testing with HUAWEI

2  CHINA.

3       9.    In June 2010, Futurewei Technologies, Inc. d/b/a Huawei Technologies

4  (USA), the predecessor corporation of HUAWEI USA, entered into a Supply Agreement

5  with T-Mobile to supply wireless phones to T-Mobile. The terms of this Supply

6  Agreement made it binding upon any successor entities, such as HUAWEI USA. Under

7  this Supply Agreement, HUAWEI USA's predecessor acknowledged that it would be

8  receiving confidential information from T-Mobile as part of their business relationship,

9  including trade secrets, intellectual property, and technical information. HUAWEI USA's

10  predecessor agreed that such confidential information would remain T-Mobile's

11  exclusive property and that it would not use such information except in the performance

12  of its agreement with T-Mobile.

13       10.    In 2011, pursuant to this Supply Agreement, Huawei began supplying

14  phones to T-Mobile that T-Mobile subsequently marketed and sold throughout the United

15  States. Prior to this time, Huawei had no measurable share of the wireless phone market

16  in the United States, the third largest wireless phone market in the world. Huawei placed

17  great value on developing its relationship with T-Mobile, and viewed that relationship as

18  an important step to gaining a foothold in the United States market.

19       11.    In or about August 2012, T-Mobile agreed to grant HUAWEI USA

20  engineers access to T-Mobile's Tappy robotic testing system for the purpose of testing

21  Huawei phones prior to their release. Prior to granting this access, T-Mobile required

22  HUAWEI USA to execute two nondisclosure agreements containing multiple

23  confidentiality provisions. HUAWEI USA, with the knowledge and approval of

24  HUAWEI CHINA, executed these two nondisclosure agreements on August 14, 2012,

25  and August 16, 2012. Under the terms of the agreements, HUAWEI USA executed them

26  "on behalf of itself, its parents, [and] affiliates," including HUAWEI CHINA. In these

27  agreements, HUAWEI USA made material promises and representations to T-Mobile,

28  including that its employees would not, among other things: (a) photograph T-Mobile's

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1 Tappy robotic testing system; (b) attempt to copy or discover Tappy's software source
2 codes or trade secrets; (c) attempt to reverse-engineer Tappy's software or hardware
3 components; or (d) attempt to circumvent any security measures that prevented
4 unauthorized access to Tappy. In addition, HUAWEI USA represented in the
5 nondisclosure agreements that its employees would access the Tappy system solely for
6 the purpose of testing Huawei phones, and for no other purpose, and that it would not use
7 T-Mobile's confidential information except in the performance of its agreement with
8 T-Mobile. T-Mobile relied upon all of the representations made by HUAWEI USA in
9 the nondisclosure agreements in granting HUAWEI USA's employees access to Tappy.
10 In mid-September 2012, based on the representations made by HUAWEI USA in these
11 agreements, T-Mobile began to admit approved HUAWEI USA employees to the Tappy
12 robot laboratory for phone testing.

13      **C.**    **Huawei's Efforts to Steal Tappy's Technology.**

14     12.    During in or about 2012, HUAWEI CHINA began developing its own
15 phone testing robot, known as xDeviceRobot. HUAWEI CHINA intended to use
16 xDeviceRobot in China to test the phones it would supply to T-Mobile and other
17 competing wireless carriers, including China Mobile and AT&T. HUAWEI CHINA was
18 attempting to design its own robotic testing system for multiple reasons. First, the phones
19 that HUAWEI CHINA supplied to T-Mobile generally were not of high quality, and the
20 phones were failing Tappy's testing at a disproportionate rate compared to other
21 suppliers' phones. HUAWEI CHINA hoped that it could improve the quality of phones
22 that it supplied to T-Mobile by utilizing its own robot testing earlier in the process, while
23 the phones were still under development in China. Second, HUAWEI CHINA hoped that
24 robotic testing would improve the quality of its phones generally, including phones that it
25 supplied to competing wireless carriers, including China Mobile and AT&T.

26     13.    In early May 2012, while the above-referenced nondisclosure agreements
27 were being drafted and negotiated, R.Y., the HUAWEI USA Director of Technical
28 Acceptance, inquired, on behalf of HUAWEI CHINA, whether T-Mobile would be

INDICTMENT/HUAWEI DEVICE CO. et al. - 6

1  willing to sell or license the Tappy robot system to HUAWEI CHINA.  T-Mobile

2  declined to do so.  R.Y. then communicated to engineers at HUAWEI CHINA that

3  T-Mobile had "no plan to sell the robot system" to phone manufacturers such as Huawei.

4  He further explained that T-Mobile's reasons for this included that it did not want the

5  Tappy technology to be used to improve phones that Huawei would supply to T-Mobile's

6  competitors, such as AT&T, and it did not want to reveal Tappy's software source code

7  to phone manufacturers such as Huawei.

8        14.     After that, in 2012 and continuing through May 2013, HUAWEI CHINA,

9  with help from HUAWEI USA employees, undertook a scheme to steal T-Mobile's

10  Tappy technology for use in the development of its xDeviceRobot.  In furtherance of this

11  scheme, and over the course of numerous telephonic and electronic communications,

12  HUAWEI CHINA employees who were involved in the development of the

13  xDeviceRobot directed HUAWEI USA employees who had access to Tappy to gather a

14  variety of technical details about Tappy.

15        15.     On or about June 30, 2012, F.W., a HUAWEI CHINA engineer working on

16  the xDeviceRobot project, convened a conference call with multiple HUAWEI USA and

17  HUAWEI CHINA engineers.  F.W. created a list of questions for HUAWEI USA

18  employees to answer about the Tappy robot, including requesting photos of the Tappy

19  robot from different angles, and detailed technical specifications of Tappy, including

20  component serial numbers, camera resolution, the sliding speed of the mechanical arm,

21  and the method of calculating the user interface response time.  HUAWEI USA engineer

22  H.L., in turn, posed many of these same questions to T-Mobile engineers.  In response to

23  these and similar questions, T-Mobile employees provided only limited information

24  about Tappy and declined to provide additional information about the technical

25  specifications of the Tappy system.  H.L. and other HUAWEI USA employees informed

26  the HUAWEI CHINA engineers that T-Mobile was unwilling to provide this sort of

27  information due to "information security regulations."

28

INDICTMENT/HUAWEI DEVICE CO. et al. - 7

1    16.    During August and September 2012, by email and other communications,
2  HUAWEI CHINA engineers continued to task HUAWEI USA employees with
3  determining the technical specifications of the Tappy robot, despite having been made
4  aware that T-Mobile was unwilling to disclose confidential technical information about
5  Tappy. For example, in an email sent on September 10, 2012, H.P., HUAWEI CHINA's
6  Director of Device Testing Management Department, stated, "The main point is to figure
7  out the [Tappy] Robot's specifications and functions. These are the benchmarks of
8  products developed by ourselves." HUAWEI USA employee R.Y. replied that T-Mobile
9  was unwilling to provide this sort of technical information. In emails sent on September
10  8 and 11, 2012, R.Y. explained that T-Mobile was unwilling "to share the detail of robot
11  tech/docs" with suppliers, such as Huawei, and that T-Mobile refused to "provide us the
12  details of robot hardware and software specifications."
13    17.    On November 6, 2012, HUAWEI CHINA engineer J.Y. sent an email to
14  HUAWEI USA employee R.Y. stating: "[T]his email is just a kindly reminder for the
15  information we need to build our own robot system and kindly feedback the information
16  we need in the attachment. . ." Attached to the email was a PowerPoint file requesting
17  information about the technical specifications of the Tappy robot hardware components
18  and software systems. On November 7, 2012, R.Y. forwarded this email to two
19  HUAWEI USA engineers, including A.X., and directed them to provide the requested
20  information to HUAWEI CHINA. R.Y. also assured J.Y.: "[The HUAWEI USA
21  engineers] have accessed the [T-Mobile] robot lab . . . They know how TMO robot work
22  and system info. I asked them to write down the info in detail and then send to
23  [HUAWEI CHINA]."
24    18.    On November 15, 2012, HUAWEI USA engineer A.X. replied to J.Y.:
25  "I am sorry we can not get more information from TMO and we can't finish the whole
26  [PowerPoint] as we talk about. And as you know, we can take some pictures of test
27  procedure and setting. Hope it is useful to HQ R&D." The following day, on November
28  16, 2012, A.X. sent an email to J.Y. and other HUAWEI CHINA engineers with multiple

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

unauthorized photos of the Tappy robot and its software interface system that A.X. had taken inside of the secure T-Mobile lab, in violation of the nondisclosure agreements HUAWEI USA signed.

19.     In December 2012, HUAWEI CHINA engineers continued to task the HUAWEI USA employees to provide them with the same technical specifications and details about Tappy that T-Mobile previously had declined to share with HUAWEI USA and HUAWEI CHINA. T-Mobile again refused to provide this information. On December 20, 2012, R.Y. informed J.Y. and other HUAWEI CHINA engineers: "We got not much information from TMO on these questions that you guys asked. Again, TMO won't want to share any more information about their robot system with us. However, we still try to find more information during our test in TMO robot lab. But it won't expect anytime soon."

20.     On December 31, 2012, J.Y. sent an email to multiple HUAWEI CHINA engineers and HUAWEI USA employees, including R.Y. and A.X., stating: "We are still working on the Robot system and we had some issues with the system at the moment." J.Y. then asked the HUAWEI USA employees detailed information about Tappy, including whether the software test scripts were customized per device, about the touch speed of the robot system, about how the rubber tip was installed on the robot system, and whether there was any air space inside of the tip. On January 1, 2013, A.X. replied with answers to some of these questions, and attached unauthorized photographs of the Tappy robot system that he had taken inside of the secure T-Mobile lab, in violation of the nondisclosure agreements HUAWEI USA signed.

21.     On January 5, 2013, J.Y. sent another email to HUAWEI USA employees, including R.Y. and A.X., asking them for additional technical information about the Tappy robot system, specifically seeking details about "the response time accuracy of TMO's mechanical arm." That same day, A.X. replied that T-Mobile would not provide that information. On January 7, 2013, R.Y. sent an email to J.Y. and other HUAWEI CHINA engineers emphasizing: "Once again, we CAN'T ask TMO any

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  questions about the robot. TMO is VERY angry the questions that we asked. Sorry we
2  can't deliver any more information to you." R.Y. suggested that HUAWEI CHINA send
3  its own engineer to Seattle to gain direct access to Tappy, stating, "You will learn a lot in
4  knowledge and experience."

5       22.    During March and April 2013, HUAWEI CHINA engineers continued to
6  task HUAWEI USA employees to provide them with the same sorts of technical
7  specifications and details about Tappy that T-Mobile previously had declined to share.
8  For example, on or about March 28, 2013, F.W., a HUAWEI CHINA engineer working
9  on the xDeviceRobot project, sent an email to HUAWEI USA engineer H.L. and other
10  HUAWEI CHINA and HUAWEI USA employees, stating, "From the results of the
11  recent xDeviceRobot system [] verification, there is still a definite disparity with
12  T-Mobile [robot]." F.W. tasked H.L. to obtain and provide information about the Tappy
13  robot arm and end effector tip, including its contact hardness, contact area, and pressure.
14  H.L. replied that HUAWEI CHINA should contact the manufacturer of the Tappy robot
15  arm directly, rather than having HUAWEI USA try to get the requested information from
16  T-Mobile. H.L. explained that going through T-Mobile "would only backfire" and that
17  "[a]fter signing a confidentiality agreement at the TMO laboratory, the relevance of this
18  information to us was very sensitive."

19       23.    By in or about mid-April 2013, HUAWEI CHINA was encountering
20  difficulties with its development of the xDeviceRobot, and HUAWEI CHINA engineers
21  continued to direct HUAWEI USA employees to attempt to steal information about
22  Tappy. On April 12, 2013, HUAWEI CHINA engineer J.Y. sent an email to several
23  HUAWEI CHINA employees, including the leader of the xDeviceRobot development
24  team, and HUAWEI USA employees, including R.Y. and A.X. The email tasked the
25  HUAWEI USA employees to provide additional technical information about, among
26  other things, Tappy's calibration standards and what tools and software Tappy used to
27  calculate delays during performance testing.

28

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

24. On April 12, 2013, in response to the above-referenced email from J.Y., HUAWEI USA employee R.Y. again suggested that HUAWEI CHINA send its own engineer to the United States who could access Tappy directly and thereby surreptitiously learn the information that HUAWEI CHINA was seeking, but that T-Mobile had been refusing to provide. Specifically, R.Y. stated:

> First of all, I am glad that HQ R&D has been continuing to improve HUAWEI robot system. Based on the test on [T-Mobile phone] we do see a big difference of test results between TMO robot and Huawei robot. I think we have a lot of work to improve our robot performance. The difference between two is not only the hardware but also (most importantly) the software. TMO has spend much more money on software than hardware.
>
> Once again, we can't get any further information about TMO robot system from TMO. They have complained [to] us a lot about this because we asked them too many questions of the robot based on HQ's request. TMO said to me that if we ask them again such questions, they don't allow us to use their robot Lab. . . . TMO has set up a security system by putting camera into the robot Lab. I think everyone knows what this means. . . . We can't provide any further information to HQ because we can't get anything from TMO.
>
> Once again, I suggested HQ to send an engineer to TMO for a hands-on experience by playing the robot system. I believe this would give HQ robot team a huge benefit in understanding TMO robot system from hardware and software, as well as operation.

25. On April 12, 2013, another HUAWEI USA employee, who served as a manager in the Technical Acceptance Department, replied to the above email string and explained his understanding of the reasons why T-Mobile considered the Tappy robot to be confidential and proprietary property, and was refusing to provide HUAWEI USA and HUAWEI CHINA with the technical specifications and details about the robot:

> [T-Mobile] is clear that those such as Huawei and Samsung are not only supplying TMO, but are also supplying their competitors such as Verizon, ATT, and other carriers.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1. If every Vendor is helped to establish TMO testing environment and standards, it would certainly also improve the product quality, etc. of each Vendor's competitors, which is equivalent to TMO doing a good deed for the industry.

2. TMO took about four years of time and lots of resource optimization to develop the Robot system, and it contains TMO's intellectual property rights.

3. TMO can provide a free testing environment for each Vendor, and it can ensure that this system only services TMO products. This only enhances the competitiveness of TMO.

26. On April 12, 2013, the HUAWEI USA Executive Director of Technical Acceptance also replied to the above email string, emphasizing that T-Mobile "strictly controlled" what the Huawei engineers could do in their lab, specifically that they "are limited to usage [of Tappy], and everything else is categorically denied." The email went on to state: "Due to answering headquarters' questions, our employees have had two complaints raised against them, and it was declared that if we inquired again, Huawei's credentials for using the TMO Robot Laboratory would end." The Executive Director of Technical Acceptance, echoing R.Y.'s prior suggestions, encouraged HUAWEI CHINA to send its own engineer to Seattle to gain direct access to Tappy.

**D.    The Thefts During May 2013.**

27. HUAWEI CHINA decided to send its own engineer to Seattle, and designated F.W. to make the trip. On April 17, 2013, F.W. sent an email to the HUAWEI USA Executive Director of Technical Acceptance describing one of the goals of his upcoming trip as: "For the mechanical arm issues, go to the [T-Mobile] laboratory for reconnaissance and obtain measurement data." HUAWEI USA approved the travel and submitted paperwork to obtain a temporary visa for F.W. F.W. arrived in the United States on or about May 11, 2013.

28. On May 13, 2013, HUAWEI USA employees A.X. and H.L. improperly abused their badge access to allow F.W. into the T-Mobile laboratory where the Tappy

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1 robot was located. A T-Mobile employee discovered that F.W. was in the laboratory
2 without permission and told him to leave.

3     29.     On the following day, May 14, 2013, F.W. returned to the T-Mobile
4 laboratory, again without authorization. A.X. again improperly abused his badge access
5 to allow F.W. into the laboratory. While inside the Tappy robot chamber, F.W. took
6 numerous unauthorized photographs of Tappy, and otherwise gathered technical
7 information about the robot, for the purpose of helping HUAWEI CHINA's development
8 of the xDeviceRobot. A T-Mobile employee again discovered that F.W. was in the
9 laboratory without permission and told him to leave.

10     30.     On or about May 15 and 16, 2013, F.W. sent a series of emails to numerous
11 employees of HUAWEI CHINA and HUAWEI USA, including the HUAWEI CHINA
12 Director of Device Testing Management Department and the engineers working on the
13 xDeviceRobot project. These emails contained multiple attachments, including
14 photographs of the Tappy robot and related testing equipment that F.W. had taken inside
15 the T-Mobile lab; and a document entitled "Robot Environmental Information," which
16 discussed in detail the mechanical assembly, operation, and other technical details of the
17 Tappy robot as reflected in the photos and based on F.W.'s observations inside the
18 T-Mobile lab. In one of the emails, F.W. stated, "I went once more today to TMO's
19 mechanical arm testing laboratory and gained an overall understanding of the test
20 environment. I summarized it, please take a look," referring to the attachments. F.W.
21 further explained that T-Mobile had prohibited him from re-entering the laboratory, and
22 that, moving forward, HUAWEI USA engineer A.X. would "help you get a deeper
23 understanding of the remaining information."

24     31.     In light of F.W.'s misconduct in the laboratory, T-Mobile notified
25 HUAWEI USA that its access to the Tappy laboratory was suspended and required
26 HUAWEI USA to return all badges that had been issued to HUAWEI USA employees.
27 T-Mobile agreed to allow one specific HUAWEI USA engineer, A.X., continued access
28

INDICTMENT/HUAWEI DEVICE CO. et al. - 13

1 to the Tappy laboratory for limited testing related to particular Huawei phones that were
2 already scheduled for upcoming release.

3     32.     On May 21, 2013, HUAWEI CHINA engineer J.Y. emailed HUAWEI
4 USA engineer A.X. (copying R.Y. and H.L.), directing him to provide information about
5 the specifications, operations, and componentry of the Tappy robot, including details
6 about the method of calculating the user interface response time; the shape, diameter, and
7 hardness of the capacitor pen tip; the calibration method and process of force control; the
8 sensors used to support the robotic arm and main camera; and "lots of photos and video
9 of test process." On May 22, 2013, A.X. replied by email stating, "We'll certainly help if
10 we can; this period is very sensitive," referring to the fact that T-Mobile had restricted
11 HUAWEI USA's access to the Tappy robot lab. On May 23, 2013, A.X. replied again
12 and provided some of the information requested in J.Y.'s email. In response to J.Y.'s
13 request for "lots of photos and video of test process," A.X. stated, "After TMO gives
14 back our badges, I'll send it back home. No need for home to keep reminding me."

15     33.     On or about May 29, 2013, a HUAWEI CHINA engineer emailed A.X. and
16 copied other HUAWEI CHINA engineers who were working on the xDeviceRobot
17 project (including J.Y. and F.W.). The HUAWEI CHINA engineer asked A.X. to
18 determine the diameter of a part of Tappy's robot arm; specifically, the end tip of the
19 conductor stick.

20     34.     Later on May 29, 2013, A.X. used his badge to access the T-Mobile Tappy
21 laboratory. As he was preparing to leave the laboratory, A.X. surreptitiously placed one
22 of the Tappy robot arms into his laptop bag and secretly removed it from the laboratory.
23 T-Mobile employees discovered the theft later that day, and contacted A.X. A.X. initially
24 falsely denied taking the robot arm, but then later claimed he had found it in his bag.
25 A.X. described the incident a "mistake" and offered to return the part. On the following
26 day, May 30, 2013, when the T-Mobile lab reopened, A.X. returned the stolen robot arm
27 to T-Mobile. T-Mobile thereafter revoked A.X.'s access to the laboratory and no longer
28 allowed any HUAWEI USA employees in the facility without an escort.

INDICTMENT/HUAWEI DEVICE CO. et al. - 14

35.     During the night of May 29-30, 2013, while A.X. had the stolen robot arm in his possession outside of the T-Mobile laboratory, F.W. took measurements of various aspects of the robot arm, including of the end tip of the conductor stick, and took photographs of the robot arm.  Some of the photographs depicted the precise width of certain parts of the robot arm by showing a measuring device next to the parts.  On or about May 29-30, 2013, F.W. sent these photographs as attachments via email to HUAWEI CHINA engineers including J.Y.  F.W.'s email contained an explanation of multiple detailed measurements for various parts of the Tappy robot arm, including the end tip of the conductor stick, and how the various pieces were configured together. F.W.'s email concluded with, "See pictures for details."

36.     On or about May 30, 2013, A.X. participated in a conference call with multiple HUAWEI CHINA engineers who were involved with the xDeviceRobot project. On or about May 30-31, 2013, following up on issues discussed during the conference call, A.X. emailed multiple HUAWEI CHINA engineers, reporting the specific width of the tip of Tappy's conductor stick and that F.W. had "obtained the probe."  In response, one of the HUAWEI CHINA engineers requested that A.X. obtain a more precise measurement of the conductor stick using a caliper device.  A.X. replied that F.W. had "already sent the pictures home."

### E.     Huawei's Efforts to Cover-up its Thefts.

37.     T-Mobile's discovery of the theft of the robot part and F.W.'s unauthorized access of the laboratory caused great and immediate concern for HUAWEI CHINA and HUAWEI USA for several reasons.  First, Huawei greatly valued its business relationship with T-Mobile, which was Huawei's first significant customer in the United States wireless phone market.  HUAWEI CHINA and HUAWEI USA were concerned that T-Mobile would terminate its relationship with them as a result of the incidents in the laboratory, thereby compromising Huawei's ability to successfully enter the United States wireless phone market.  Second, HUAWEI CHINA and HUAWEI USA were concerned about the potential for federal civil litigation.  Specifically, HUAWEI CHINA

INDICTMENT/HUAWEI DEVICE CO. et al. - 15

and HUAWEI USA feared that T-Mobile would file a civil lawsuit against them in the United States District Court for the Western District of Washington, seeking monetary damages and other relief, as the result of their theft and related misconduct. Third, HUAWEI CHINA and HUAWEI USA were concerned that T-Mobile would refer the matter to federal law enforcement authorities, prompting a Federal grand jury investigation in the Western District of Washington.

38.    Lastly, HUAWEI CHINA and HUAWEI USA were concerned about additional harm to Huawei's reputation because the company had already been the subject of negative publicity regarding the company's past practice of misappropriating proprietary business information and technology. For example, on October 2, 2012, the United States House of Representatives Permanent Select Committee on Intelligence issued a public report finding that Huawei posed a potential threat to national security, emphasizing, among other things, the company's "pattern of disregard for the intellectual property rights of other entities and companies in the United States." Moreover, the report stated that the Committee's investigation had uncovered information that Huawei "may be violating United States laws" and "very serious allegations of illegal behavior" by Huawei, all of which the Committee would be referring to federal authorities "for potential investigation." In addition, Huawei had been the subject of multiple lawsuits that had received negative public attention. In 2010, Motorola sued Huawei alleging that it had misappropriated Motorola's proprietary wireless switching technology by acquiring it surreptitiously from Chinese Motorola engineers. In 2003, Cisco sued Huawei alleging that Huawei had stolen Cisco's proprietary network router technology and related source code for use in Huawei's own competing routers.

39.    In light of all of these concerns, HUAWEI CHINA and HUAWEI USA attempted to affirmatively mislead T-Mobile about what had happened in T-Mobile's laboratory. To that end, HUAWEI USA issued a 23-page "Investigation Report," authored by its Chief Legal Counsel for Labor and Employment and its Executive Director of Human Resources. The report purported to summarize the findings of an

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

"internal investigation" into the above-described misconduct in the T-Mobile laboratory and related activities. In June 2013, as part of the "internal investigation," HUAWEI USA memorialized statements by HUAWEI USA and HUAWEI CHINA employees A.X. and F.W., and made them available for interviews with T-Mobile security personnel. During these interviews, A.X. and F.W. made false and misleading statements designed to conceal the full scope of Huawei's misconduct in attempting to steal T-Mobile's technology, including the extent to which other HUAWEI USA and HUAWEI CHINA employees were involved and the degree to which the Tappy technology had been compromised.

40. In emails sent on July 5, 2013, and August 9, 2013, the HUAWEI USA Executive Director of Human Resources informed T-Mobile that HUAWEI USA had "conducted our internal investigation here in the U.S.," and also that "Huawei HQ (China) has conducted a thorough investigation." The Executive Director represented that the investigations "confirmed" that A.X. and F.W. were "two individuals who acted on their own" and who "violated our Company's policies and thus they were both terminated for cause."

41. HUAWEI USA issued the formal Investigation Report on or about August 13, 2013. Shortly thereafter, in or about August or September 2013, HUAWEI USA provided T-Mobile with a redacted version of the Investigation Report. The Investigation Report contained several false and misleading statements about the events that had transpired. The report falsely stated that F.W. and A.X. had acted on their own, that their actions in May 2013 were "isolated incidents," and that the two "were lacking in their awareness of Huawei's cyber security policies." In fact, as HUAWEI USA and HUAWEI CHINA both well knew, the actions of F.W. and A.X. were undertaken at the direction of, and in coordination with, HUAWEI CHINA employees and were part of a months-long course of conduct to steal unauthorized technical information about Tappy.

42. The Investigation Report also stated that F.W. took nine photographs in the laboratory "[i]n a moment of indiscretion." The report intentionally omitted the fact that

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  HUAWEI CHINA and HUAWEI USA employees had secretly and deliberately taken
2  unauthorized photographs of Tappy on multiple prior occasions, and that
3  HUAWEI CHINA had issued numerous directives to HUAWEI USA to gather technical
4  information about Tappy, and photographs of Tappy, for the purpose of developing
5  Huawei's own xDeviceRobot.
6      43.    The Investigation Report stated that F.W. sent only four photographs of
7  Tappy to HUAWEI CHINA employees.  The report intentionally omitted the fact that,
8  after being caught in the T-Mobile laboratory for the second time, F.W. had circulated to
9  HUAWEI CHINA engineers a six-page report containing technical information about
10  Tappy, along with at least seven unauthorized photographs of the robot.  The report also
11  omitted the fact that even after F.W. had been barred from reentering the laboratory, he
12  designated A.X. to provide HUAWEI CHINA engineers with a "deeper understanding of
13  the remaining information" they were attempting to gather about Tappy.
14      44.    The Investigation Report stated that, after A.X. had taken the robot part, he
15  provided seven measurements of the part to a HUAWEI CHINA robotics engineer during
16  a telephone call.  The report intentionally omitted that, in the days preceding and
17  following his theft of the robot part, A.X. also had exchanged multiple emails with
18  HUAWEI CHINA robotics engineers, providing them technical information he had
19  gathered about Tappy.  The report also omitted that A.X. had previously taken
20  unauthorized photographs of Tappy and sent the photographs to robotics engineers at
21  HUAWEI CHINA.
22      45.    On October 2, 2013, T-Mobile asked HUAWEI USA to provide them with
23  any and all emails about Tappy that A.X. and F.W. had sent to other Huawei employees.
24  HUAWEI USA declined to provide any such emails.  On October 8, 2013, as part of
25  HUAWEI CHINA's and HUAWEI USA's continuing cover-up, the HUAWEI USA
26  Executive Director of Human Resources sent an email to T-Mobile stating: "Based on
27  our findings, there are not a lot of emails corresponding between [A.X. and F.W.] and
28  [HUAWEI CHINA] engineers that were related to [Tappy.]  One or two of the emails

INDICTMENT/HUAWEI DEVICE CO. et al. - 18

that remotely mentioned . . . the robot were related to the testing results between [Tappy] and the Huawei Testing." In truth and in fact, there were numerous emails between HUAWEI CHINA robotics engineers and A.X. and F.W. pertaining to HUAWEI CHINA's and HUAWEI USA's efforts to steal unauthorized technical information about Tappy.

46.    On or about May 5, 2014, T-Mobile sent HUAWEI USA a legal demand letter threatening to file a civil lawsuit against HUAWEI USA unless it paid T-Mobile monetary damages and took other remedial measures as the result of the theft and related misconduct. In response, in or about May 2014, HUAWEI USA produced the full, un-redacted Investigation Report to T-Mobile. Huawei in-house counsel also wrote letters to T-Mobile claiming that HUAWEI USA and HUAWEI CHINA had been "forthright" and had "cooperated" with T-Mobile after the events of May 2013, and representing that HUAWEI USA had provided to T-Mobile "many documents in regards to our internal investigation." The letters from the Huawei attorneys also reiterated the false claim that A.X. and F.W. were "misguided" and had acted on their own without direction or involvement by other HUAWEI USA or HUAWEI CHINA employees.

47.    On July 10, 2013, at the same time that HUAWEI CHINA and HUAWEI USA were falsely claiming that the conduct of A.X. and F.W. was "isolated," constituted a "moment of indiscretion," and was contrary to Huawei's corporate polices, HUAWEI CHINA launched a formal policy instituting a bonus program to reward employees who stole confidential information from competitors. Under the policy, HUAWEI CHINA established a formal schedule for rewarding employees for stealing information from competitors based upon the confidential value of the information obtained. Employees were directed to post confidential information obtained from other companies on an internal Huawei website, or, in the case of especially sensitive information, to send an encrypted email to a special email mailbox. A "competition management group" was tasked with reviewing the submissions and awarding monthly bonuses to the employees who provided the most valuable stolen information. Biannual

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

awards also were made available to the top three regions that provided the most valuable information. The policy emphasized that no employees would be punished for taking actions in accordance with the policy.

48.     The launch of this HUAWEI CHINA bonus program policy created a problem for HUAWEI USA because it was in the midst of trying to convince T-Mobile that the conduct in the laboratory was the product of rogue employees who acted on their own and contrary to Huawei's policies. As a result, on July 12, 2013, the HUAWEI USA Executive Director of Human Resources sent an email to all HUAWEI USA employees addressing the bonus program. The email described the bonus program as: "[I]ndicat[ing] that you are being encouraged and could possibly earn a monetary award for collecting confidential information regarding our competitors and sending it back to [HUAWEI CHINA]." The email went on to say: "[H]ere in the U.S.A. we do not condone nor engage in such activities and such a behavior is expressly prohibited by [HUAWEI USA's] company policies." The email did not state that the bonus program had been suspended by HUAWEI CHINA. Rather, the email emphasized that "in some foreign countries and regions such a directive and award program may be normal and within the usual course of business in that region."

**F.     Tappy was Protected as a Trade Secret.**

49.     The Tappy robot system technology, as further described in paragraphs 3 and 4 above, including the information and know-how relating to the design, assembly, and operating methods of the T-Mobile testing robot; the specifications, source code, component selection, operating instructions, and other non-public elements of the robot technology; and proprietary combinations and implementations of the robot, contained and constituted trade secrets in that: T-Mobile took reasonable measures to keep such information secret; and the information derived independent economic value, actual and potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who could obtain economic value from the disclosure or use of the information.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

**G.     Overt Acts in Furtherance of the Conspiracy.**

50.     During and in furtherance of the conspiracy, in Bellevue, within the Western District of Washington, and elsewhere, one or more of the conspirators committed one or more of the following overt acts, among others:

a.     On or about September 10, 2012, H.P., the HUAWEI CHINA Director of Device Testing Management Department, sent an email directing HUAWEI USA employees to "figure out the [Tappy] Robot's specifications and functions," for the unauthorized purpose of furthering HUAWEI CHINA's xDeviceRobot program.

b.     On or about November 16, 2012, HUAWEI USA engineer A.X. sent an email to HUAWEI CHINA engineers containing multiple unauthorized photos of the Tappy robot and its software interface system that A.X. had taken inside of the secure T-Mobile lab, in violation of the nondisclosure agreements HUAWEI USA had signed.

c.     On or about January 1, 2013, HUAWEI USA engineer A.X. sent an email to HUAWEI CHINA engineers containing confidential technical information about the Tappy robot and multiple unauthorized photos of the robot and its software interface system that A.X. had taken inside of the secure T-Mobile lab, in violation of the nondisclosure agreements HUAWEI USA had signed.

d.     On or about April 12, 2013, R.Y., the HUAWEI USA Director of Technical Acceptance, sent an email to HUAWEI CHINA employees stating that HUAWEI USA had been unable to obtain the confidential technical information about Tappy that HUAWEI CHINA had been asking for, and suggesting that HUAWEI CHINA should send its own engineer to the United States who could access Tappy directly and thereby surreptitiously learn the information that HUAWEI CHINA was seeking.

e.     On or about May 13, 2013, F.W., acting on behalf of HUAWEI CHINA, entered the T-Mobile robot laboratory, without authorization, for the purpose of obtaining technical information about the Tappy technology, for the unauthorized purpose of furthering HUAWEI CHINA's robot program.

INDICTMENT/HUAWEI DEVICE CO. et al. - 21

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1       ·f.     On or about May 14, 2013, F.W., acting on behalf of

2 HUAWEI CHINA, entered the T-Mobile robot laboratory, without authorization, for the

3 purpose of obtaining technical information about the Tappy technology, as well as taking

4 unauthorized photographs of a Tappy robot, for the unauthorized purpose of furthering

5 HUAWEI CHINA's robot program.

6       g.     On or about May 29, 2013, A.X., acting on behalf of

7 HUAWEI USA, and at the direction of HUAWEI CHINA, entered the T-Mobile robot

8 laboratory for the purpose of stealing a Tappy robot part, without authorization, for the

9 unauthorized purpose of furthering HUAWEI CHINA's robot program.

10       h.     On or around August 13, 2013, HUAWEI USA generated an

11 "Investigation Report" to provide to T-Mobile, as part of HUAWEI USA's and

12 HUAWEI CHINA's efforts to conceal the conspiracy, including the extent to which the

13 Tappy technology already had been compromised.

14       i.     On or around October 8, 2013, the HUAWEI USA Executive

15 Director of Human Resources emailed T-Mobile, misrepresenting the extent of email

16 communications between A.X., F.W., and HUAWEI CHINA engineers that were related

17 to Tappy, as part of HUAWEI USA's and HUAWEI CHINA's efforts to conceal the

18 conspiracy, including the extent to which the Tappy technology already had been

19 compromised.

20     All in violation of Title 18, United States Code, Sections 1832(a)(1), (a)(2), (a)(3),

21 and (a)(5).

22

23               **COUNT 2**
         **(Attempted Theft of Trade Secrets)**

24

25     51.     Paragraphs 2 through 49 above are incorporated herein.

26     52.     Between on or about April 12, 2013, and on or about May 31, 2013, at

Bellevue, within the Western District of Washington, and elsewhere, HUAWEI DEVICE

27 CO., LTD. and HUAWEI DEVICE USA, INC. attempted to:

28

INDICTMENT/HUAWEI DEVICE CO. et al. - 22

(a) knowingly and without authorization steal, appropriate, take, carry away, and conceal trade secrets belonging to T-Mobile; and by fraud, artifice, and deception obtain trade secrets belonging to T-Mobile;

(b) knowingly and without authorization copy, duplicate, sketch, draw, photograph, download, replicate, transmit, deliver, send, communicate, and convey trade secrets belonging to T-Mobile; and

(c) knowingly receive, buy, and possess trade secrets belonging to T-Mobile, knowing the same to have been stolen, appropriated, obtained, and converted without authorization;

intending to convert a trade secret that is related to a product used and intended for use in interstate and foreign commerce, to the economic benefit of someone other than T-Mobile, and knowing that the offense would injure T-Mobile.

All in violation of Title 18, United States Code, Section 1832(a)(1)-(4).

## COUNTS 3-9
### (Wire Fraud)

53.     Paragraphs 2 through 49 above are incorporated herein.

**A.      The Scheme and Artifice to Defraud.**

54.     Beginning at a time unknown, but no later than in or about June 2012, and continuing until on or about September 2, 2014, at Bellevue, within the Western District of Washington, and elsewhere, HUAWEI DEVICE CO., LTD. and HUAWEI DEVICE USA, INC. devised and intended to devise a scheme and artifice to defraud, and to obtain property by means of materially false and fraudulent pretenses, representations, promises, and the concealment of material facts.

55.     The essence of the scheme and artifice to defraud was for HUAWEI DEVICE CO., LTD. and HUAWEI DEVICE USA, INC., through their employees, to access the Tappy robot laboratory for the unauthorized purpose of secretly obtaining technical information about the Tappy robot, on the false pretense and representation that only authorized activity would be conducted in the laboratory.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

**B.    Manner and Means of the Scheme and Artifice to Defraud.**

56.    It was part of the scheme and artifice to defraud that HUAWEI DEVICE USA, INC. ("HUAWEI USA"), on behalf of itself and HUAWEI DEVICE CO., LTD. ("HUAWEI CHINA"), represented to T-Mobile in the aforementioned nondisclosure agreements that they would conduct only authorized activity within the Tappy robot laboratory, while intending that their employees would obtain confidential technical information about the Tappy technology, for the unauthorized purpose of furthering HUAWEI CHINA's xDeviceRobot program.

57.    It was part of the scheme and artifice to defraud that HUAWEI CHINA and HUAWEI USA, through their employees, represented to T-Mobile that they would conduct only authorized activity within the Tappy robot laboratory, and abide by the restrictions in the aforementioned nondisclosure agreements, each time one of their employees used a T-Mobile-issued access badge to gain entry to the laboratory.

58.    It was part of the scheme and artifice to defraud that HUAWEI CHINA and HUAWEI USA used the limited access granted by T-Mobile to the Tappy robotic testing system to gather unauthorized confidential technical information about Tappy, for the purpose of furthering the development of Huawei's xDeviceRobot, contrary to the promises and representations made by HUAWEI CHINA and HUAWEI USA to T-Mobile as described in paragraphs 56 and 57.

59.    It was part of the scheme and artifice to defraud that HUAWEI CHINA and HUAWEI USA used the limited access granted by T-Mobile to the Tappy robotic testing system to take unauthorized photographs of Tappy, for the purpose of furthering the development of Huawei's xDeviceRobot, contrary to the promises and representations made by HUAWEI CHINA and HUAWEI USA to T-Mobile as described in paragraphs 56 and 57.

60.    It was part of the scheme and artifice to defraud that HUAWEI CHINA sent an employee to the United States in order to conduct reconnaissance on T-Mobile's Tappy technology, for the purpose of furthering the development of Huawei's

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

xDeviceRobot, contrary to the promises and representations made by HUAWEI CHINA and HUAWEI USA to T-Mobile as described in paragraphs 56 and 57.

61.     It was part of the scheme and artifice to defraud that HUAWEI USA and HUAWEI CHINA stole, measured, and photographed a Tappy robot part, for the purpose of furthering the development of Huawei's xDeviceRobot, contrary to the promises and representations made by HUAWEI CHINA and HUAWEI USA to T-Mobile as described in paragraphs 56 and 57.

62.     It was part of the scheme and artifice to defraud that HUAWEI CHINA and HUAWEI USA attempted to mislead T-Mobile through the "Investigation Report," concealing the scope of their misconduct in attempting to steal T-Mobile's technology, including the extent to which the technology had been compromised.

**C.      Execution of the Scheme and Artifice to Defraud.**

63.     On or about the dates set forth below, at Bellevue, within the Western District of Washington, and elsewhere, HUAWEI DEVICE CO., LTD. and HUAWEI DEVICE USA, INC., having devised the above-described scheme and artifice, for the purpose of executing this scheme and artifice, did knowingly transmit and cause to be transmitted by wire communication in interstate and foreign commerce writings, signs, signals, pictures, and sounds, to wit:

| Count | Date | Sender | Wire Transmission |
|-------|------|--------|-------------------|
| 3 | April 12, 2013 | HUAWEI USA | Email from the Western District of Washington to China discussing obtaining unauthorized technical information about Tappy |
| 4 | May 15, 2013 | HUAWEI CHINA | Email from the Western District of Washington to China containing and discussing unauthorized photographs and other technical information gathered about Tappy |

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

| 5 | May 16, 2013 | HUAWEI CHINA | Email from the Western District of Washington to China containing and discussing unauthorized photographs and other technical information gathered about Tappy |
| 6 | May 23, 2013 | HUAWEI USA | Email from the Western District of Washington to China containing and discussing unauthorized technical information gathered about Tappy and discussing additional information to be gathered |
| 7 | May 29-30, 2013 | HUAWEI CHINA | Email from the Western District of Washington to China containing photographs, measurements, and other unauthorized technical information gathered about Tappy |
| 8 | May 30-31, 2013 | HUAWEI USA | Email from the Western District of Washington to China containing and discussing unauthorized technical information gathered about Tappy |
| 9 | October 8, 2013 | HUAWEI USA | Email from Texas to the Western District of Washington regarding the Investigation Report |

All in violation of Title 18, United States Code, Sections 1343 and 2.

## COUNT 10
### (Obstruction of Justice)

64.     Paragraphs 2 through 49 above are incorporated herein.

65.     Beginning on or about June 1, 2013, and continuing through on or after September 2, 2014, at Bellevue, within the Western District of Washington, and elsewhere, HUAWEI DEVICE CO., LTD. and HUAWEI DEVICE USA, INC. attempted

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1 | to corruptly obstruct, influence, and impede an official proceeding, that is, the

2 | proceedings in *T-Mobile USA, Inc. v. Huawei Device USA, Inc.*, C14-1351RAJ, in the

3 | United States District Court for the Western District of Washington; and Federal grand

4 | jury proceedings in the Western District of Washington concerning HUAWEI DEVICE

5 | CO., LTD. and HUAWEI DEVICE USA, INC.

6 |     All in violation of Title 18, United States Code, Sections 1512(c)(2) and 2.

7 | ## ASSET FORFEITURE ALLEGATION

8 |     66.    The allegations contained in Counts 1-9 of this Indictment are hereby

9 | realleged and incorporated by reference for the purpose of alleging forfeiture pursuant to

10 | Title 18, United States Code, Section 2323(b); Title 18, United States Code, Section

11 | 981(a)(1)(C); and Title 28, United States Code, Section 2461(c).

12 | ### Counts 1-2

13 |     67.    Pursuant to Title 18, United States Code, Section 2323(b)(1), upon

14 | conviction of any of the offenses alleged in Counts 1-2 of this Indictment, the defendants,

15 | HUAWEI DEVICE CO., LTD. and HUAWEI DEVICE USA, INC., shall forfeit to the

16 | United States (1) any property used, or intended to be used, in any manner or part to

17 | commit or facilitate the commission of the offense and (2) any property constituting or

18 | derived from any proceeds obtained directly or indirectly as a result of the commission of

19 | the offense, including but not limited to a judgment for a sum of money representing the

20 | property described in this paragraph.

21 | ### Counts 3-9

22 |     68.    Pursuant to Title 18, United States Code, Sections 981(a)(1)(C), and

23 | Title 28, United States Code, Section 2461(c), upon conviction of any of the offenses

24 | alleged in Counts 3-9 of this Indictment, the defendants, HUAWEI DEVICE CO., LTD.

25 | and HUAWEI DEVICE USA, INC., shall forfeit to the United States any property, real

26 | or personal, which constitutes or is derived from proceeds traceable to the offense,

27 | including but not limited to a judgment for a sum of money representing the property

28 | described in this paragraph.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

69. If any of the above described forfeitable property, as a result of any act or omission of the defendants,

      a.     cannot be located upon the exercise of due diligence;

      b.     has been transferred or sold to, or deposited with, a third party;

      c.     has been placed beyond the jurisdiction of the Court;

      d.     has been substantially diminished in value; or

      e.     has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 18, United States Code, Section 2323(b)(2); Title 21, United States Code, Section 853(p); and Title 28, United States Code, Section 2461(c), to seek the forfeiture of any other property of the defendants up to the value of the above-described forfeitable property.

A TRUE BILL:

DATED: *16 January 2019*

*Signature of foreperson redacted pursuant to the policy of the Judicial Conference of the United States*

FOREPERSON

_____
ANNETTE L. HAYES
United States Attorney

_____
TODD GREENBERG
Assistant United States Attorney

_____
THOMAS M. WOODS
Assistant United States Attorney

INDICTMENT/HUAWEI DEVICE CO. et al. - 28